26197. WESTBROOK, administrator, v. SAYLORS.

DECIDED OCTOBER 28, 1937.

*Mitchell & Mitchell,* for plaintiff in error.
*R. Carter Pittman,* contra.

BROYLES, C. J. W. M. Saylors brought suit against M. Westbrook as administrator of the estate of J. C. Saylors, alleging in the first count of his petition that he had taken J. C. Saylors into his home, and that he and his family (except a son H. S. Saylors, who was sui juris and whose services were not included in plaintiff's suit) had rendered certain specified services to J. C. Saylors for approximately eight years, for which J. C. Saylors agreed to make a will leaving his property to the plaintiff; that J. C. Saylors did not make the will, thereby breaching his contract and therefore the plaintiff was entitled to recover damages in the amount of the value of the estate. In the second count the plaintiff relied upon the contract implied by law that the intestate pay for the services rendered, and based his claim on a quantum meruit. The defendant denied the material allegations of each count. The jury rendered a verdict in favor of the plaintiff on the second count, for $50 a month for four years, without interest. The defendant made a motion for a new trial, which was overruled, and on this judgment error is assigned.

There was ample evidence to show that the plaintiff, a nephew of J. C. Saylors, took the intestate into his home when the intestate was seventy-five years of age, furnished him lodging and board, had his washing done, and nursed and cared for him for a period of approximately eight years until the death of the in-

testate at the age of eighty-three years; that the intestate did no work and paid the plaintiff nothing for these services during these eight years; that during this time the intestate had a chronic kidney trouble which caused him continually to wet the bedclothing and his wearing apparel, thus necessitating frequent washing of these things, which was done by plaintiff's minor daughter, Bertie; that, regardless of constant nursing, washing, and precaution, the clothing of J. C. Saylors exuded an offensive odor which was endured by plaintiff and his family, who were closely associated in the house with the intestate; that the health of the intestate was such that he required almost constant care and nursing by the plaintiff and his family; that, in addition to the kidney trouble, the intestate broke his right arm, and was cared for in this respect by plaintiff's said daughter; that plaintiff paid all the expense of looking after the intestate; that the intestate kept a car, and because of his weakened and infirm condition he had to be taken from place to place by a member of plaintiff's family; that the intestate had stated that he was treated kindly by the plaintiff and his family, and that he was going to leave his property to them for taking care of him; that he had nephews and nieces other than plaintiff, and had also a brother and a sister, and when asked why he did not stay with them "he said none of his folks would keep him except Will Saylors [the plaintiff], and said he wanted him to have all he had at his death." Though the verdict was not based on the breach of the contract to make a will, it was based on an implied contract to pay a reasonable amount for the services; and this evidence tends to establish the fact that it was the intention of the intestate to compensate the plaintiff for the services rendered. Mrs. Grover Stone, a witness for the defendant, testified that she had done some washing for the intestate, but stated that it had been three years since she did it, and "it was a job to wash his clothes, and it was certainly very unpleasant to wash them when I did." There was some circumstantial evidence that the intestate had made some contribution to his support. A witness for the defendant testified that the intestate had traded some at his store during the last four years, but that "about the only thing I remember he bought was flour." There was no testimony that this flour or any other groceries went to the plaintiff or to the plaintiff's home;

but, on the contrary, there was direct evidence that the plaintiff "worked and bought the food and supplied the provisions for the family, and paid for the food J. C. Saylors ate; he also paid the expenses of looking after him, which was all done by members of the family." The witness for the defendant, who worked in a store, identified three checks for $2, $1.85, and $1.80. The evidence does not show that these checks were signed by J. C. Saylors; but conceding that they were, there is no evidence that they were given for groceries or for anything that went to the plaintiff or to the plaintiff's home. The witness testified: "What any of these checks were given for I don't know. Whether these checks were given for cash or for groceries I couldn't be positive. I do cash checks for people I know." It is not unlikely, under the evidence, that the intestate cashed these checks for small amounts for his own convenience in procuring cash. It was admitted that the deceased left an estate of $2212 in the First National Bank of Dalton, $1430.91 in the Bank of Dalton, 320 acres of land, and some notes and accounts. There was little circumstantial evidence and no direct evidence that the intestate ever paid the plaintiff anything for the services rendered. There was direct and positive evidence that the intestate lived with the plaintiff for approximately eight years, at a period of his life when he was very old and in bad health and required much care and nursing; that he paid the plaintiff nothing for this service; that the intestate and the plaintiff understood that the plaintiff was to be compensated for the services after the death of the intestate; that the intestate was a bachelor, and that there were several persons whose kinship to the intestate was equal to that of the plaintiff, and two persons whose kinship to the intestate was closer than that of the plaintiff, all of whom refused to care for him. A brother of the intestate, a witness for the defendant, admitted that he had not seen or written to the intestate for twenty-one years.

The plaintiff has a much stronger claim than a child of the deceased would have, because children are under a moral duty to care for infirm parents without compensation. However, even a child may recover when it appears that services were rendered under a contract, and a fortiori a nephew may do so. In *Phinazee* v. *Bunn*, 123 *Ga.* 230 (51 S. E. 300), it was said: "Children being under a moral duty to nurse and care for their infirm parents,

a promise to pay is not implied from the mere fact of service, as in case of strangers. But the performance of such service is a sufficient consideration for an express promise to pay. *Hudson v. Hudson,* 87 *Ga.* 678 [13 S. E. 583, 27 Am. St. R. 270]; *Butler* v. *Billups,* 101 *Ga.* 102 [28 S. E. 615]; *Weaver* v. *Cosby,* 109 *Ga.* 310, 316 [34 S. E. 680]. While a contract to pay will not be implied from the mere performance of the services, there are cases where the law will *imply a contract* by a parent to pay a child for services of the character above referred to. In *Murrell* v. *Sludstill,* 104 *Ga.* 606 [30 S. E. 750], Mr. Justice Lewis said: *'This court has never decided that on account of relationship, however near, there can be no recovery for services rendered by one relative to another without proof of an express contract.'* In *Hudson* v. *Hudson,* 90 *Ga.* 581 [16 S. E. 349], it was held that a recovery may be had if an express contract be shown, *or if the 'surrounding circumstances . . indicate that it was the intention of both parties that compensation should be made, and negative the idea that the services were performed merely because of that natural sense of duty, love, and affection arising out of this relation.'* This ruling was reaffirmed in *O'Kelly* v. *Faulkner,* 92 *Ga.* 522 [17 S. E. 847], though in that case the evidence was not sufficient to show that payment for the services was in the contemplation of both parties. See also *Weaver* v. *Cosby,* 109 *Ga.* 316 [supra]; *Walker* v. *Brown,* 104 *Ga.* 361 [30 S. E. 867]. In the cases of *Murrell* v. *Sludstill,* 104 *Ga.* 604 [supra], and *Hurst* v. *Lane,* 105 *Ga.* 506 [31 S. E. 135], no express contract was shown; and it was held that the circumstances were such as to show that the parties contemplated that the plaintiffs (one a grandchild and the other a niece) should receive compensation for their services." (Italics ours.) In *Banks* v. *Howard* 117 *Ga.* 94 (43 S. E. 438), it was said: "Contracts under which one of the contracting parties agrees with the other, for a valuable consideration, that he will make a will giving to the other property, either real or personal, have been sustained and enforced in America from the earliest times, and the validity of such contracts seems now to be beyond all doubt. [Citations.] Where a party in whose favor the will is to be made has performed his part of the contract and the other party dies without making the will . . the disappointed party may . . bring an action at law

on a quantum meruit for the value of the services, relying upon the implied promise of the law in such cases." (Citations.) In *Strahley* v. *Hendricks,* 40 *Ga. App.* 571 (3) (150 S. E. 561), it was said: "This being a suit on a quantum meruit, evidence that the intestate had stated that the plaintiff's 'folks had been kind to him and he was going to take care of them and give them a part of what he had,' was relevant for the purpose of showing that the services and other things received were not intended to be accepted as gratuitous, but that there was an implied promise to pay for them." (Citations.) See also *Jackson* v. *Buice,* 132 *Ga.* 51, 53 (63 S. E. 823); *Edwards* v. *Smith,* 42 *Ga. App.* 730 (157 S. E. 348); *Watts* v. *Rich,* 49 *Ga. App.* 334 (175 S. E. 417). It will be noted from the evidence stated above that the plaintiff and his family kept and cared for the intestate for a period of approximately eight years; but the claim for services rendered prior to four years before suit, on a quantum meruit basis, would be barred by the statute of limitations; and the finding of the jury, on a quantum meruit basis, covered only the last four years of such services. In view of the age and physical infirmities of the intestate during these last four years of his life, the evidence amply authorized the finding that his lodging, board, washing of his wearing apparel and bedclothing, and nursing and caring for him were worth $50 a month without interest, as found by the jury. The general grounds of the motion for new trial are without merit.

The only special ground of the motion shows that counsel for the defendant asked the witness Henry Saylors why he did not ask the intestate to pay him some on his (Henry's) driving bill; counsel for the defendant stating that Henry was suing for such services. Counsel for the plaintiff objected to the question, on the ground that counsel for the defendant was endeavoring in this case to try Henry's case, which was based on an alleged promise of J. C. Saylors to pay him for driving; that the plaintiff in this case was suing for the reasonable value of his services and that of all members of his family except Henry. The court sustained the objection. Counsel for the movant insisted that the court should allow the witness to answer the question, because "it goes to the credit of this witness before this jury." The record shows that Henry Saylors was sui juris, that his services to the intestate

were not included in the suit of the plaintiff, and that the witness had filed a suit based on an alleged promise of the intestate to pay him for driving. The suit of the witness and that of the plaintiff were entirely separate and distinct, and whether the deceased had paid the witness, or refused to pay him, or had promised to pay him for driving had nothing to do with the instant case. One can not introduce wholly irrelevant testimony on the ground that he wants the jury to test the credibility of the witness. Moreover, the witness had testified at length on relevant matters from which testimony the jury had an opportunity to test his credibility. This ground shows no cause for a new trial. The evidence authorized the verdict. No error of law appears; and the court did not err in refusing to grant a new trial.

*Judgment affirmed. MacIntyre and Guerry, JJ., concur.*